We will now move to case number 6 of the morning, Dunn v. Saul. This is appeal number 19-1399 and we are going to begin with Mr. Marvin. Good morning, your honors. May it please the Mr. Dunn appeals the denial of a claim for social security disability benefits. He alleges disability primarily due to residual effects of a traumatic brain injury that he suffered many years ago in 1990. The ALJ in this case denied the claim at step two, didn't go through the full sequential evaluation process, found that the cognitive impairment caused effectively no limitation in the ability to perform any work functions. ALJ made several errors in this analysis, the primary one being that the ALJ altogether failed to address records from Mr. Dunn's past attempts at working. There were records submitted from a job that he had that showed significant limitations that were consistent with his allegations. The ALJ made no mention of these records in the administration's own regulations in 20 CFR 404-1529A, which state that the administration will consider any evidence that you submit in support of your allegations. There's no indication from the ALJ's decision that he gave these any consideration. It's also inconsistent with the precedent of this court. Several cases say that the ALJ may not ignore an entire line of evidence, and also that an ALJ must address significant evidence favorable to the claimant before denying a claim. The ALJ didn't do that in this case. Mr. Marwin, can I ask you about, one difficulty I was having is that, and I'm thankful for the way you put your point here, that you said the employment records from, what was it, from Bonton? Yes. You know, show the Mr. Dunn's significant limitations. Yes. Okay. That's what I'm not as sure about. Okay. They definitely, as you lay out in their brief, they show difficulties with the employment, right, with issues with supervisors and not performing the job and what have you. But how do they address significant limitations? In other words, how do we connect what happened and why it may have happened in his experience at Bonton with any functional limitations that bear upon, you know, the ability to work? Okay. I think there are a couple things. First, Mr. Dunn's testimony, I think, makes the connection where he explains, you know, I had this head injury and things were progressively getting worse for me. I didn't exactly know why. But the kinds of things that he said he had problems with, you know, he would forget instructions. If he, the work records show, for example, that he wouldn't complete tasks that were assigned to him and didn't follow instructions. He testified that in his daily life, for example, if he needed to go to the grocery store and get something, even if he only needed two items, he would need to have a list so he would remember. And the limitations that you see in the records are consistent with the diagnosis of the mild cognitive impairment, which causes problems with memory and executive function. These are the same kinds of problems he was having. He frequently showed up to work late and he made that connection in his testimony that he said he was doing that because he would forget he had to go to work. He would get in the car and drive and forget where he was supposed to go. So it's the way we get to a failure, if there is one, on the ALJ's part with respect to the is through the combined failure to piece the claimant's testimony together with the information that comes from the employment records. Well, I think the medical evidence is also a factor here as well. You know, he eventually did have neurological examinations and the results of those examinations, I think, are consistent with what you see in the work records. Those examinations, in the record, page 321 and 327, it shows that on a map memory test, he performed poorly. Now, what I understand that test to be is you show a person a map for a certain amount of time, take it away from them, ask them questions about it immediately, and then after five minutes, ask the questions again. So his performance on these examinations, in the first place, he would remember everything asked of him. And then after five minutes on the first examination, he only remembered one thing. On the second, he only remembered two. So in a work environment, you know, if a supervisor gives you four things to do, and you can remember them all in the first place, then after five minutes, you don't remember them, then you're not going to be able to sustain work. You're going to have problems. And I think that those test results are consistent with the records you see, with the limitations in the work records. At the hearing, how long did Mr. Dunn testify for? I don't know the exact amount of time, but it was a fairly short hearing. I can pull up the record. Sure. If you could, my question goes to the idea of him not being, the ALJ not including the information, the evidence with regard to the Banton employment history. Is that something that also could have been questioned about by Mr. Dunn's counsel? Well, Mr. Dunn's counsel did bring up the records at the hearing. They were submitted. He referenced them at the end of the hearing, mentioned them to the ALJ. I think the ALJ referred to them as those little evaluation things. And then the attorney said that, if you'd like, it appeared from the record that the ALJ was not familiar with them. He hadn't reviewed them. The claimant's attorney said, if you'd like, I can brief this for you after the hearing. And the ALJ said, that won't be necessary. I understand it. But he understood it. He didn't make any reference to it in the decision. And I think the claimant was entitled to have some reference to that in the decision. If you look at it from the claimant's perspective, he got what he thought was the strongest evidence of his inability to work. He brought it in, gave it to the ALJ, got a denial from Social Security that made no reference to what he thought was the strongest evidence. And he was entitled to some reference to that. Not just out of fairness, but under the regulations and under the precedent of this court. Would you like to reserve the remainder of your time? Yes, I will. Very good. Thank you, Mr. Marvin. We'll now move for counsel for the appellee, Mr. Buddy. May it please the court. I'm Steve Buddy on behalf of the commissioner. It was Mr. Dunn's burden to prove his claim and present evidence to support it. The record shows he had a concussion in 1990. Dunn testified he began experiencing problems in 2005 and alleged he was totally disabled by 2012. But the first time in the medical records that he sought any treatment for any cognitive problems wasn't until 2015. That year, Mr. Dunn sought treatment for memory problems a total of two times on both occasions. Aside from a recall test, exam findings were normal. Dunn was independent in activities. And between his concussion in 1990 and 2015, Dunn's medical records do not document any complaints of any cognitive problems to treatment providers. In fact, Dunn actually sought urgent care treatment in 2014 after injuring his head, hitting it on a closet door. At that point, he never reported cognitive symptoms to those medical and neurological findings were normal. A CT scan showed an old frontal lobe injury, but the only diagnosis were an abrasion and a head contusion. No provider ever indicated Dunn had any functional limitations. Instead, the psychologists that examined him for the agency, Dr. Wergelitz, and four reviewing doctors all opined he had no impairment. Dr. Wergelitz examined Dunn in 2014, and the contrast between that examination and Dunn's disability claim is pretty stark. At Dr. Wergelitz's exam, Mr. Dunn reported no impairment in activities such as caring for grandchildren, watching TV, reading, socializing. He could readily concentrate on a task until it was finished. He could understand and remember what he watched and read. Dunn reported only that his impairment was headaches. Dr. Wergelitz's examination findings and testing were normal. He found that Dunn had an excellent short-term memory, a good delayed memory, and a superior immediate memory, and he was readily able to recall many significant events of his life. Dr. Wergelitz declined to diagnose anything. And when he asked Mr. Dunn about the cognitive impairment, Mr. Dunn denied even alleging it. On this record, the ALJ reasonably concluded that Mr. Dunn had not proven that his mild cognitive impairment would cause more than minimal work limitations. The agency applies a special technique, we call it, to assess mental impairments. They rate a claimant's functioning in four broad functional areas. The ALJ did that. He found no more than mild impairment in daily living, social functioning, concentration, or episodes of decompensation. And the finding of no more than mild impairments is what drove the ALJ to find a non-severe impairment in this case. What do you make of Mr. Marvin's point, though, about the combination of Mr. Dunn's testimony, his daughter's testimony, and what you see in those employment records from Bonton? You know, they paint a different picture, do they not? Well, the employment records show that Dunn had poor work performance. They don't themselves attribute that performance to an impairment. Only Dunn's testimony makes that connection. But the ALJ explained that it wasn't crediting Dunn's testimony because it was inconsistent with the record. I mean, Dunn reported, he cited Dunn's reports to the agency earlier in his adult function reports. He cited Dunn's presentation at Dr. Borgelow's examination. I think that's the starkest contrast. And then even Dunn's reports to Dr. Grudczyk, the doctor you saw in 2015. Dunn reported independence in all daily activities. He alleged memory problems. But, again, Dr. Borgelow's exam in 2014 was two years into his plain disability period, and at that time Dunn had an excellent memory, basically an intact memory. So I think Dr. Borgelow's exam is the strongest evidence that rebutts any inference that those employment records were relevant, that his poor performance was caused by an impairment. And this Court has repeatedly held that ALJs aren't required to discuss every piece of evidence in the record. It specifically held in the context of employment records that ALJs don't commit reversible error by not discussing them. It's recognized in some cases that a claimant with a positive work history might be entitled to a favorable inference, but it's also recognized in those same cases that not discussing the records isn't reversible error. And there's no regulation or agency policy that specifically says ALJs have to discuss every piece of evidence in the record. Mr. Budde, should we make something of this difference between the two scales that Dr. Grudczyk used, the medical term mild versus an agency definition? It sounds like he had a binary definition, and the agency definition is going to be more nuanced. Well, I think that the impairment, mild cognitive impairment, again, the ALJ credited that diagnosis as an important point. That's the only diagnosis any provider ever made, and again, that wasn't until 2015. We concede counsel's point that mild cognitive impairment, that diagnosis doesn't mean mild the way the agency means mild. But based on this record, there's just very little evidence that would support Mr. Dunn's claim. Again, there's only two times he ever sought treatment for this impairment that he testified had started in 2005, and he didn't seek any treatment until 2015, even though he claimed he was disabled three years earlier. Just touching briefly on the MRI, we argued in the brief that Mr. Dunn weighed the issue by not making this argument before the district court. But I think more importantly, we have an interpretation of the MRI from Dr. Grudczyk. Dr. Grudczyk reviewed the MRI and said that all it showed was an old frontal lobe injury. This is the same finding that was already revealed in the 2014 CT scan that Dr. Wuerglitz reviewed, and all the state agency doctors reviewed the CT scan, so the MRI didn't really contain any new significant evidence. And again, it's Mr. Dunn's burden to prove his disability claim. If you want another opinion about the MRI, it's his responsibility to seek one, and if the court were to order that a new ALJ set to require it, find a new opinion every time there's a new imaging study, any of these cases would just never end. I think it's important to remember that substantial evidence review is very deferential to the ALJ. As the Supreme Court put it in BSTEC earlier this year, the bar is not high. So long as there's more than a scintilla of evidence, the court must affirm the decision. We submit that the decision in this case satisfies the standard and request that the court affirm it. Thank you, Mr. Budde. Mr. Marvin Rubato. Thank you. One point the commissioner makes says that the evidence was inconsistent with or the allegations were inconsistent with the evidence in the record. A major problem I have with that is that the ALJ completely disregarded a significant portion of the record. The way I see it, there are really three parts of this record. There's claims allegations, which show up in his paperwork to the administration and testimony, as well as statements of his daughter. Then you have the medical evidence, and then you have the work records, and you have to put all those three things together. So when the commissioner talks about anything being inconsistent with the record, I don't think they can really make that argument because the ALJ altogether failed to address what I think is really a significant third part of the record. The ALJ has to consider everything together and come to a conclusion on its own. As far as the work records not making the connection with the medical condition, there's no reason that work records would. Employers really aren't looking at why a person is doing poorly. They're just saying that a person is doing poorly. So when you look at everything comprehensively, the way he was doing it poorly is consistent with his condition. I also want to point out ALJ's reliance on activities of daily living in this case. ALJ says that he was capable of doing several things like shopping, taking care of the grandchildren, cooking, that sort of thing, but leaves out a lot of the things that Mr. Dunn said he had problems with in those activities. For example, with cooking, he said he'd ruined about a dozen pots because he'd put water on the boil and then would leave it. ALJ doesn't make any mention of that. As far as caring for the grandchildren, his daughter testified that she'd come home and he would have forgotten to change the kid's diapers. With driving, he said he would get in the car and forget where he was going. So ALJ listed a whole lot of things that he said Mr. Dunn was capable of doing, but when you really look at his allocations in the file, he wasn't capable of doing these things very well at all and had significant limitations in even basic daily activities. As far as the MRI, I think the ALJ had to interpret this evidence on his own in order to make any findings. No doctor who gave an opinion on functional limitations had seen the MRI and didn't know what it showed. So the ALJ referenced it, he listed it in the decision, but there was really no way for him to know what exactly that diagnosis was. The encephalomalacia, which is brain damage, that's not something that showed up in the earlier CT scan that the state agency doctors had access to. So no doctor who gave an opinion on functional limitations had seen this, and no doctor who gave an opinion was even aware of the diagnosis of mild cognitive impairment. So I think because those things were submitted, the ALJ had a duty to, rather than independently interpret the evidence, seek another opinion and say, what does this mean functionally? If there are no other questions. Thank you, Mr. Marvin. Thank you, Mr. Budde. The case will be taken under advisement. Thank you.